**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**Hartford Division**

IN RE: CHAPTER 13

Walter Hutton

DEBTOR CASE NO. 15-22042

---

Walter Hutton

MOVANT

VS

OCWEN LOAN SERVICING, LLC

RESPONDENT

**OPPOSITION TO DEBTOR'S MOTION TO DETERMINE SECURED STATUS**

Ocwen Loan Servicing, LLC, in its capacity as servicer for HSBC Bank USA, N.A., as Trustee for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2004-SD1, Asset Backed Pass-Through Certificates ("**Ocwen**"), by and through its attorneys, Leopold & Associates, PLLC, hereby submits its Opposition (the "**Opposition**") to Walter Hutton's (the "**Debtor**") Motion to Determine Secured Status (the "**Motion**") with respect to the property located at 23-25 Sargeant Street Hartford, Connecticut, 06105 (the "**Property**"). In support thereof, Ocwen respectfully states as follows:

**BACKGROUND**

1. On or about November 26, 2015, the Debtor filed a voluntary bankruptcy petition for relief under Chapter 13 of the Bankruptcy Code.

2. Ocwen currently holds a first mortgage on the Property. A copy of the Note, Mortgage and Affidavit of Lost Assignment is annexed hereto as Exhibit A.

3. By virtue of the mortgage, Ocwen is a secured creditor pursuant to the mortgage on the Property.

4. On or about April 26, 2016 the Debtor filed the Motion to Determine the secured status of the Property under 11 U.S.C. § 506.

5. In his Motion, Debtor contends that the secured claim held by Ocwen should be valued at $58,000.00 and that the claim should be treated as unsecured pursuant to 11 U.S.C. § 506.

**ARGUMENT**

6. Initially, the Debtor understates the value of the Property and the valuation provided does not provide an accurate valuation for the Property.

7. Ocwen has obtained a more accurate and more recent valuation of the Property, dated April 11, 2016, which values the Property at $125,000.00 (the "**Ocwen Valuation**"). A copy of Ocwen's Valuation is annexed hereto as Exhibit "A".

8. Additionally, Debtor has provided no legal authority to explain why a blight lien that was recorded in July 2013 would be granted super-priority status, thereby rendering Ocwen's secured claim as a completely unsecured claim.

9. Finally, Debtor has failed to provide a modification (nor does Ocwen have any record of an approval) of any modification offer from 2013. Therefore, Debtor's allegation that the mortgage lost its priority is baseless and completely without merit.[1]

[1] Notwithstanding the fact that there was no modification approval in 2013, *assuming arguendo* that a modification offer was made in 2013, (which it was not) Debtor's argument that Ocwen's lien would lose priority because the modification was not recorded would still fail because any proposed modification would not adversely affect the Debtor. *See Sperry v. U.S. Bank National Association*, Adv. Pro. No. 13-01144 (Bankr. E.D.N.Y. August 14, 2014) (discussing under New York state law how because modification did not prejudice debtor by increasing principal amount or interest rate, there was no basis to subordinate lender's lien) (J. Craig).

**WHEREFORE**, Ocwen respectfully requests the court enter an Order denying Debtor's

Motion in its entirety.

Dated: May 11, 2016
    New York, New York

**LEOPOLD & ASSOCIATES, PLLC**

/s/ Michael T. Rozea
Michael T. Rozea, Esq.
Attorney for Ocwen Loan Servicing, LLC
80 Business Park Drive
Armonk, New York 10504
Telephone: (914) 219-5787 Ext. 140

# EXHIBIT A

**Northeast Savings**

Ok#

# ADJUSTABLE RATE NOTE

(Interest Rate Limits)

**This Note contains provisions allowing for changes in my interest rate every year subject to the limits stated in this Note. If my interest rate increases, my monthly payments will be higher. If my interest rate decreases, my monthly payments will be lower.**

Hartford, Connecticut
[City] [State]

October 29, 19 84

23-25 Sargeant Street Hartford Connecticut 06105
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 61,700.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is NORTHEAST SAVINGS, F.A. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on that part of principal which has not been paid, beginning on the date I receive principal and continuing until the full amount of principal has been paid.

Beginning on the date I receive principal, I will pay interest at a yearly rate of 12.25%. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on December, 19 84. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on November 1, 20 14, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my monthly payments at Northeast Savings, F.A., 50 State Street, Hartford, Connecticut 06103 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 646.56. This amount will change if the interest rate that I must pay changes. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of November, 19 85, and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and one half percentage points (2.50%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance of my loan I am expected to owe on the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The rate of interest I am required to pay shall never be increased or decreased on any single Change Date by more than ☐ one percentage point (1.0%) ☒ two percentage points (2.0%) ***[Check only one box]*** from the rate of interest I have been paying for the preceding twelve months. My interest rate also shall never be greater than 18.0%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will mail or deliver to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates of my monthly payments unless the Note Holder agrees in writing to those delays. My partial prepayment will reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any of my monthly payments by the end of ......15...................... calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be ...5....% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on any late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed or delivered to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by mailing it by first class mail or by delivering it to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. THIS NOTE SECURED BY A SECURITY INSTRUMENT**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") with an Adjustable Rate Rider, dated the same day as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument and Rider describe how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

"**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or an interest therin is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at Lender's option, declare all the sums secured by this Security Instrument to be immediately due and payable. However, this option shall not be exercised by Lender if exercise is prohibited by Federal law as of the date of this Security Instrument.

If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such notice shall provide a period of not less than 30 days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof.

Notwithstanding a sale or transfer, Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has released Borrower in writing."

Witness the hand(s) and seal(s) of the undersigned.

[signature] ............................ (Seal)
-Borrower
WALTER HUTTON

[signature] ............................ (Seal)
-Borrower
CYNTHIA HUTTON

............................................................ (Seal)
-Borrower

*[Sign Original Only]*

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any of my monthly payments by the end of ......15...................... calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be .....5.....% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on any late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed or delivered to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by mailing it by first class mail or by delivering it to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. THIS NOTE SECURED BY A SECURITY INSTRUMENT**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") with an Adjustable Rate Rider, dated the same day as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument and Rider describe how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> "**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or an interest therin is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at Lender's option, declare all the sums secured by this Security Instrument to be immediately due and payable. However, this option shall not be exercised by Lender if exercise is prohibited by Federal law as of the date of this Security Instrument.
>
> If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such notice shall provide a period of not less than 30 days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof.
>
> Notwithstanding a sale or transfer, Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has released Borrower in writing."

Witness the hand(s) and seal(s) of the undersigned.

Walter Hutton ........................................ (Seal)
WALTER HUTTON -Borrower

Cynthia Hutton ........................................ (Seal)
CYNTHIA HUTTON -Borrower

........................................ (Seal)
-Borrower

*[Sign Original Only]*

ALLONGE TO THE NOTE

ACCOUNT NUMBER [redacted]

NAME. WALTER HUTTON AND CYNTHIA HUTTON

NOTE DATE 10/29/84

ADDRESS 23-25 SARGEANT STREET
HARTFORD, CT 06105

LOAN AMOUNT $61,700.00

PAY TO THE ORDER OF HSBC Bank USA, National Association as Trustee, in trust for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2004-SD1, Asset Backed Pass-Through Certificates
WITHOUT RECOURSE

Fleet National Bank, successor by merger to Fleet Bank, National Association, formerly known as Fleet Bank Of New York, National Association, formerly known as Shawmut Bank, New York, National Association, formerly known as Shawmut Savings And Loan Association, formerly known as Northeast Savings Federal Association

BY: [signature]
NICHOLAS J. BADAME, BANKING OFFICER

BOX NUMBER: 028
WAMU Loan#: [redacted]

26632-1

VOL 2219 PAGE 271

[Space Above This Line For Recording Data]

# OPEN-END MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on October 29, 1984. The mortgagor is WALTER HUTTON and CYNTHIA HUTTON ("Borrower"). This Security Instrument is given to NORTHEAST SAVINGS, F.A., which is organized and existing under the laws of the United States of America, and whose address is 50 State Street, Hartford, Connecticut 06103 ("Lender"). Borrower owes Lender the principal sum of SIXTY ONE THOUSAND SEVEN HUNDRED and 00/100 Dollars (U.S. $61,700.00). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on November 1, 2014. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby grant and convey to Lender and Lender's successors and assigns the following described property located in Hartford County, Connecticut:

A certain piece or parcel of land with the buildings and other improvements thereon situated on the southerly side of Sargeant Street in the Town and County of Hartford and State of Connecticut and known as Nos. 23-25 Sargeant Street (formerly known and referred to as Nos. 21-23 Sargeant Street), and being more particularly bounded and described as follows:

NORTHERLY by Sargeant Street, thirty-four (34) feet, more or less;

EASTERLY by land now or formerly of John A. Karaliunas ninety-eight (98) feet, more or less;

SOUTHERLY by land now or formerly of said Karaliunas thirty-four (34) feet, more or less; and

WESTERLY by land now or formerly of Arthur Margolis and Rose R. Margolis ninety-eight (98) feet, more or less.

Being the same premises conveyed to Walter Hutton and Cynthia Hutton by Warranty Deed of Bernice R. Moske dated October 29, 1984, together with the same rights and containing the same covenants and restrictions as contained in said deed, which deed is recorded in the Town of Hartford Land Records.

which has the address of 23-25 Sargeant Street [Street], Hartford [City], Connecticut 06105 [Zip Code] ("Property Address");

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.   Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.**   Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.**   Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") equal to one-twelfth of: (a) yearly taxes and assessments which may attain priority over this Security Instrument; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard insurance premiums; and (d) yearly mortgage insurance premiums, if any. These items are called "escrow items." Lender may estimate the Funds due on the basis of current data and reasonable estimates of future escrow items.

The Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay the escrow items. Lender may not charge for holding and applying the Funds, analyzing the account or verifying the escrow items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing that interest shall be paid on the Funds. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Security Instrument.

If the amount of the Funds held by Lender, together with the future monthly payments of Funds payable prior to the due dates of the escrow items, shall exceed the amount required to pay the escrow items when due, the excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly payments of Funds. If the amount of the Funds held by Lender is not sufficient to pay the escrow items when due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as required by Lender.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 19 the Property is sold or acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.**   Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to late charges due under the Note; second, to prepayment charges due under the Note; third, to amounts payable under paragraph 2; fourth, to interest due; and last, to principal due.

**4. Charges; Liens.**   Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Preservation and Maintenance of Property; Leaseholds.**   Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property; Mortgage Insurance.**   If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") equal to one-twelfth of: (a) yearly taxes and assessments which may attain priority over this Security Instrument; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard insurance premiums; and (d) yearly mortgage insurance premiums, if any. These items are called "escrow items." Lender may estimate the Funds due on the basis of current data and reasonable estimates of future escrow items.

The Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay the escrow items. Lender may not charge for holding and applying the Funds, analyzing the account or verifying the escrow items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing that interest shall be paid on the Funds. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Security Instrument.

If the amount of the Funds held by Lender, together with the future monthly payments of Funds payable prior to the due dates of the escrow items, shall exceed the amount required to pay the escrow items when due, the excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly payments of Funds. If the amount of the Funds held by Lender is not sufficient to pay the escrow items when due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as required by Lender.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 19 the Property is sold or acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to late charges due under the Note; second, to prepayment charges due under the Note; third, to amounts payable under paragraph 2; fourth, to interest due; and last, to principal due.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Preservation and Maintenance of Property; Leaseholds.** Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property; Mortgage Insurance.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the insurance in effect until such time as the requirement for the insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

**8. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**12. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**13. Legislation Affecting Lender's Rights.** If enactment or expiration of applicable laws has the effect of rendering any provision of the Note or this Security Instrument unenforceable according to its terms, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument and may invoke any remedies permitted by paragraph 19. If Lender exercises this option, Lender shall take the steps specified in the second paragraph of paragraph 17.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note had no acceleration occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraphs 13 or 17.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**19. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraphs 13 and 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**20. Lender in Possesion.** Upon acceleration under paragraph 19 or abandonment of the Property, Lender (in person, by agent or by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Any rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Security Instrument.

**21. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**22. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**23. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

[X] Adjustable Rate Rider  [ ] Condominium Rider  [ ] 2-4 Family Rider
[ ] Graduated Payment Rider  [ ] Planned Unit Development Rider
[ ] Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

[signature] MITCHELL A. COHEN ........ [signature] ........(Seal) —Borrower
WALTER HUTTON

[signature] HENRY L. KROEGER III ........ [signature] ........(Seal) —Borrower
CYNTHIA HUTTON

[Space Below This Line For Acknowledgment]

STATE OF CONNECTICUT, ........... HARTFORD ................... County ss: Hartford

The foregoing instrument was acknowledged before me this . . 29th day of October, 1984 ..........
(date)

by . . . Walter Hutton and Cynthia Hutton . . . ,
(person acknowledging)

who acknowledged the same to be ...... their ........ free act and deed.

(Official Seal)

........ [signature] ........
Commissioner of the Superior Court
~~Notary Public~~
MITCHELL A. COHEN

My Commission expires:

OCT 30 9 31 AM '84
TOWN CLERK HARTFORD
VOL 2219 PAGE 276

(Space Below This Line Reserved For Lender and Recorder)

RETURN: SCHATZ & SCHATZ, RIBICOFF & KOTKIN

8 3 8 10

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**19. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraphs 13 and 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**20. Lender in Possesion.** Upon acceleration under paragraph 19 or abandonment of the Property, Lender (in person, by agent or by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Any rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Security Instrument.

**21. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**22. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**23. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

[X] Adjustable Rate Rider [ ] Condominium Rider [ ] 2-4 Family Rider
[ ] Graduated Payment Rider [ ] Planned Unit Development Rider
[ ] Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

Mitchell A. Cohen ................(Seal) —Borrower
WALTER HUTTON

Henry B. Kroeger III ................(Seal) —Borrower
CYNTHIA HUTTON

[Space Below This Line For Acknowledgment]

STATE OF CONNECTICUT, ........... HARTFORD ..................... County ss: Hartford

The foregoing instrument was acknowledged before me this 29th day of October, 1984 (date)

by Walter Hutton and Cynthia Hutton (person acknowledging),

who acknowledged the same to be their free act and deed.

(Official Seal)

Commissioner of the Superior Court ~~Notary Public~~
MITCHELL A. COHEN

My Commission expires:

REC'D OCT 30 9 31 AM '84 TOWN & CITY CLERK HARTFORD VOL 2219 PAGE 276 048533

[Space Below This Line Reserved For Lender and Recorder]

RETURN: SCHATZ & SCHATZ, RIBICOFF & KOTKIN

B35



# ADJUSTABLE RATE RIDER

(Interest Rate Limits)

THIS ADJUSTABLE RATE RIDER is made this 29th day of October, 19 84, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note to NORTHEAST SAVINGS, F.A. (the "Lender") of the same date (the "Note") and covering the property described in the Security Instrument and located at:

23-25 Sargeant Street, Hartford, Connecticut 06105
[Property Address]

**The Note contains provisions allowing for changes in the interest rate every year subject to the limits stated in the Note. If the interest rate increases, the Borrower's monthly payments will be higher. If the interest rate decreases, the Borrower's monthly payments will be lower.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of 12.25 %. Section 4 of the Note provides for changes in the interest rate and monthly payments, as follows:

**"4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of November, 19 85, and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and one half percentage points (2.50 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance of my loan I am expected to owe on the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limit on Interest Rate Changes**

The rate of interest I am required to pay shall never be increased or decreased on any single Change Date by more than ☐ one percentage point (1.0%) ☒ two percentage points (2.0%) ***[Check only one box]*** from the rate of interest I have been paying for the preceding twelve months. My interest rate also shall never be greater than 18.0 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will mail or deliver to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice."

**B. CHARGES; LIENS**

Uniform Covenant 4 of the Security Instrument is amended to read as follows:

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, and other charges, fines and impositions attributable to the Property which may attain a priority over this Security Instrument, and leasehold payments or ground rents, if any, in the manner provided under paragraph 2 hereof or, if not paid in such manner, by Borrower making payment, when due, directly to the payee thereof. Borrower shall promptly furnish to Lender all notices of amounts due under this paragraph, and in the event Borrower shall make payment directly, Borrower shall promptly furnish to Lender receipts evidencing such payments. Borrower shall promptly discharge any lien which has priority over this Security Instrument; provided, that Borrower shall not be required to discharge any such lien so long as Borrower: (a) shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Lender; (b) shall in good faith contest such lien by, or defend against enforcement of such lien in, legal proceedings which in the opinion of Lender operate to prevent the enforcement of the lien or forfeiture of the Property or any part thereof; or (c) shall secure from the holder of such lien an agreement in a form satisfactory to Lender subordinating such lien to this Security Instrument.

If Lender determines that all or any part of the Property is subject to a lien which may attain a priority over this Security Instrument, Lender shall send Borrower notice identifying such lien. Borrower shall satisfy such lien or take one or more of the actions set forth above within ten days of the giving of notice.

**C. NOTICE**
Uniform Covenant 14 of the Security Instrument is amended to read as follows:

**14. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by first class mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**D. UNIFORM SECURITY INSTRUMENT; GOVERNING LAW; SEVERABILITY**
Uniform Covenant 15 of the Security Instrument is amended to read as follows:

**15. Uniform Security Instrument; Governing Law; Severability.** This form of Security Instrument combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Security Instrument and the Note are declared to be severable.

**E. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 17 of the Security Instrument is amended to read as follows:

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or an interest therein is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at Lender's option, declare all the sums secured by this Security Instrument to be immediately due and payable. However, this option shall not be exercised by Lender if exercise is prohibited by Federal law as of the date of this Security Instrument.
If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such notice shall provide a period of not less than 30 days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof. Notwithstanding a sale or transfer, Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has released Borrower in writing.

**F. COVENANT DELETED**
Non-Uniform Covenant 21 of the Security Instrument ("Future Advances") is deleted.

**G. LOAN CHARGES**
If the loan secured by the Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (1) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (2) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note.

**H. LEGISLATION**
If, after the date hereof, enactment or expiration of applicable laws have the effect either of rendering the provisions of the Note, the Security Instrument or this Adjustable Rate Rider (other than this paragraph H) unenforceable according to their terms, or all or any part of the sums secured hereby uncollectable, as otherwise provided in the Security Instrument and this Adjustable Rate Rider, or of diminishing the value of Lender's security, then Lender, at Lender's option, may declare all sums secured by the Security Instrument to be immediately due and payable.

IN WITNESS WHEREOF, Borrower has executed this Adjustable Rate Rider.

Walter Hutton ........................ (Seal)
-Borrower
WALTER HUTTON

Cynthia Hutton ........................ (Seal)
CYNTHIA HUTTON -Borrower

........................................................ (Seal)
-Borrower

*[Sign Original Only]*

**C. NOTICE**
Uniform Covenant 14 of the Security Instrument is amended to read as follows:

**14. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by first class mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**D. UNIFORM SECURITY INSTRUMENT; GOVERNING LAW; SEVERABILITY**
Uniform Covenant 15 of the Security Instrument is amended to read as follows:

**15. Uniform Security Instrument; Governing Law; Severability.** This form of Security Instrument combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Security Instrument and the Note are declared to be severable.

**E. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 17 of the Security Instrument is amended to read as follows:

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or an interest therein is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at Lender's option, declare all the sums secured by this Security Instrument to be immediately due and payable. However, this option shall not be exercised by Lender if exercise is prohibited by Federal law as of the date of this Security Instrument.
If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such notice shall provide a period of not less than 30 days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof. Notwithstanding a sale or transfer, Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has released Borrower in writing.

**F. COVENANT DELETED**
Non-Uniform Covenant 21 of the Security Instrument ("Future Advances") is deleted.

**G. LOAN CHARGES**
If the loan secured by the Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (1) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (2) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note.

**H. LEGISLATION**
If, after the date hereof, enactment or expiration of applicable laws have the effect either of rendering the provisions of the Note, the Security Instrument or this Adjustable Rate Rider (other than this paragraph H) unenforceable according to their terms, or all or any part of the sums secured hereby uncollectable, as otherwise provided in the Security Instrument and this Adjustable Rate Rider, or of diminishing the value of Lender's security, then Lender, at Lender's option, may declare all sums secured by the Security Instrument to be immediately due and payable.

IN WITNESS WHEREOF, Borrower has executed this Adjustable Rate Rider.

Walter Hutton ........................ (Seal)
-Borrower
WALTER HUTTON

Cynthia Hutton ........................ (Seal)
CYNTHIA HUTTON -Borrower

........................................................ (Seal)
-Borrower

*[Sign Original Only]*

**Prepared By: Claudy Powell**
Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, Florida 33409
[redacted]

[redacted]
**Attorney code: [redacted]**

**NOTE: PLEASE CROSS REFERENCE WITH THAT CERTAIN MORTGAGE/DEED OF TRUST RECORDED ON OCTOBER 30, 1984, IN BOOK 2219, PAGE 271, AS INSTRUMENT 04853, TOWN OF HARTFORD, CONNECTICUT RECORDS.**

## AFFIDAVIT OF LOST ASSIGNMENT

Personally appeared before the undersigned officer authorized by law to administer oaths in said State and County, comes the undersigned, who states on oath as follows:

1. That I am over 21 years of age, and competent to give this affidavit.
2. That I currently serve as an officer of **OCWEN LOAN SERVICING, LLC.** A Limited liability company Attorney-in-Fact for HSBC BANK USA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2004-SD1, ASSET BACKED PASS-THROUGH CERTIFICATES and am personally familiar with the facts set forth herein.
3. That on or about OCTOBER 29, 1984, WALTER HUTTON AND CYNTHIA HUTTON, executed a Note and a Mortgage/Deed of Trust in favor of NORTHEAST SAVINGS, F.A., which Mortgage/Deed of Trust was recorded on OCTOBER 30, 1984, IN BOOK 2219, PAGE 271, AS INSTRUMENT 04853, HARTFORD Town land records.
4. That **NORTHEAST SAVINGS, F.A.** subsequently transferred its interest in the above Note and Mortgage/Deed of Trust to **HSBC BANK USA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2004-SD1, ASSET BACKED PASS-THROUGH CERTIFICATES**. The original assignment was lost or misplaced before being recorded

This affidavit may be relied on by purchasers, sellers, lenders, attorneys and title insurers.

**HSBC BANK USA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2004-SD1, ASSET BACKED PASS-THROUGH CERTIFICATES BY ITS ATTORNEY-IN-FACT OCWEN LOAN SERVICING, LLC.**

BY: ______________________

NAME: Christina Carter

TITLE: Account Management, Manager

Signed, sealed and delivered in the presence of:

(1) ______________________ **Perry Lerner**

(2) ______________________ Harrison Whittaker

STATE OF FLORIDA }
}SS.
COUNTY OF PALM BEACH }

**POA recorded on: NOVEMBER 03, 2009**
**Instrument:** [redacted]

The foregoing instrument was acknowledged, subscribed and sworn before me on MARCH 31, 2011, by Christina Carter, Account Management, Manager at Ocwen Loan Servicing, LLC. A Limited liability company Attorney-in-Fact for HSBC BANK USA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2004-SD1, ASSET BACKED PASS-THROUGH CERTIFICATES, He/She is personally known to me.

______________________
Notary Public

**Stephen Lee**

Notary Public State of Florida
Stephen Lee
My Commission EE025759
Expires 09/13/2014

# EXHIBIT B

APPRAISAL OF



LOCATED AT:

23-25 Sargeant St
Hartford, CT  06105

FOR:

Ocwen Loan Servicing, Inc.
1100 Virginia Drive
West Palm Beach, FL 33409

BORROWER:

Walter Hutton

AS OF:

April 11, 2016

BY:

Pamela F. Stratton

# Exterior-Only Inspection Residential Appraisal Report

File No.

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 23-25 Sargeant St | City Hartford | State CT | Zip Code 06105

Borrower Walter Hutton | Owner of Public Record Waler Hutton | County Hartford

Legal Description Volume 6862, Page 204

Assessor's Parcel # 200-266-195 | Tax Year 2016 | R.E. Taxes $ 2,797

Neighborhood Name northern Hartford | Map Reference M200-B266-L195 | Census Tract 5246.00

Occupant [X] Owner [ ] Tenant [ ] Vacant | Special Assessments $ 0 | [ ] PUD | HOA $ 0 [ ] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) Market Value

Lender/Client Ocwen Loan Servicing, Inc. | Address 1661 Worthington Rd, West Palm Beach, FL 33409

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s). The subject has not been listed with GHAR MLS within the past 12 months.

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ | Date of Contract | Is the property seller the owner of public record? [ ] Yes [ ] No | Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | | One-Unit Housing Trends | | | | One-Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | [X] Urban | [ ] Suburban | [ ] Rural | Property Values | [ ] Increasing | [X] Stable | [ ] Declining | PRICE | | AGE | One-Unit | 25 % |
| Built-Up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | Demand/Supply | [ ] Shortage | [X] In Balance | [ ] Over Supply | $(000) | | (yrs) | 2-4 Unit | 55 % |
| Growth | [ ] Rapid | [X] Stable | [ ] Slow | Marketing Time | [ ] Under 3 mths | [X] 3-6 mths | [ ] Over 6 mths | 85 | Low | 0 | Multi-Family | 15 % |
| | | | | | | | | 225 | High | 125 | Commercial | 5 % |
| | | | | | | | | 125 | Pred. | 55 | Other | % |

Neighborhood Boundaries North by Tower Avenue. East by Main Street. South by Walnut Street. West by Blue Hills Avenue.

Neighborhood Description The subject is located on the northern section of Hartford, commonly referred to as the "Northend". The area is older. Homes vary in age, style and size, but blend well together. Interstate highway, employment centers, public transportation, shopping and services are within .5-3 miles in either direction. Typical urban neighborhood,

Market Conditions (including support for the above conclusions) Competitively priced homes in the area generally sell in less than 6 months. Current interest rates have stabilized the area real estate market. Housing supply is average. Interest rates are low and there appears to be an ample supply of mortgage money. Marketing time is generally under 6 months for most homes.

**SITE**

Dimensions See attached plot map | Area 3485 sf | Shape Rectangular | View N;Res;Res

Specific Zoning Classification R4 | Zoning Description Residential

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | [ ] | Water | [X] | [ ] | Street Paved | [X] | [ ] |
| Gas | [X] | [ ] | Sanitary Sewer | [X] | [ ] | Alley None | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No | FEMA Flood Zone X | FEMA Map # 09003C0364F | FEMA Map Date 09/26/2008

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe. There are no apparent adverse easements or conditions.

**IMPROVEMENTS**

Source(s) Used for Physical Characteristics of Property [ ] Appraisal Files [ ] MLS [X] Assessment and Tax Records [ ] Prior Inspection [ ] Property Owner [ ] Other (describe) | Data Source(s) for Gross Living Area Tax Assessor's Records

| GENERAL DESCRIPTION | GENERAL DESCRIPTION | Heating / Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [ ] Concrete Slab [ ] Crawl Space | [ ] FWA [X] HWBB | [ ] Fireplace(s) # 0 | [ ] None |
| # of Stories 3 | [X] Full Basement [ ] Finished | [ ] Radiant | [ ] WoodStove(s) # 0 | [X] Driveway # of Cars 3 |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | [ ] Partial Basement [ ] Finished | [ ] Other | [ ] Patio/Deck None | Driveway Surface Paved |
| [X] Existing [ ] Proposed [ ] Under Const. | Exterior Walls Composition | Fuel Gas | [X] Porch Opn&Enc | [ ] Garage # of Cars 0 |
| Design (Style) 3 Family | Roof Surface Flat-Built Up | [ ] Central Air Conditioning | [ ] Pool None | [ ] Carport # of Cars 0 |
| Year Built 1900 | Gutters & Downspouts Aluminum | [ ] Individual | [ ] Fence None | [ ] Attached [ ] Detached |
| Effective Age (Yrs) 15-20 | Window Type Double Hung | [X] Other None | [ ] Other None | [ ] Built-in |

Appliances [ ] Refrigerator [ ] Range/Oven [ ] Dishwasher [ ] Disposal [ ] Microwave [ ] Washer/Dryer [ ] Other (describe)

Finished area above grade contains: 12 Rooms 6 Bedrooms 3.0 Bath(s) 2,916 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) None noted - exterior only.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). C4;There are no apparent recent renovations or modernizations noted. There is no functional or economic obsolescence apparent.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.

# Exterior-Only Inspection Residential Appraisal Report

File

There are 10 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 123,900 to $ 159,900 .

There are 12 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 122,000 to $ 160,000 .

SALES COMPARISON APPROACH

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 23-25 Sargeant St Hartford, CT 06105 | 40 Elmer St Hartford, CT 06120 | | 33 E. Raymond St Hartford, CT 06112 | | 69 Edgewood St Hartford, CT 06112 | |
| Proximity to Subject | | 1.00 miles NE | | 0.73 miles NE | | 0.40 miles NW | |
| Sale Price | $ | | $ 122,000 | | $ 133,000 | | $ 135,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 36.27 sq. ft. | | $ 40.59 sq. ft. | | $ 37.61 sq. ft. | |
| Data Source(s) | | GHAR #G10063903;DOM 64 | | GHAR #G10068052;DOM 75 | | GHAR #G10050318;DOM 104 | |
| Verification Source(s) | | V6211/P89-O.P.$129,900 | | V7014/P135-O.P.$170,000 | | V7029/P326-O.P.$154,900 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth Conv;0 | | ArmLth Conv;0 | | ArmLth Conv;0 | |
| Date of Sale/Time | | s12/15;c09/15 | | s11/15;c10/15 | | s01/16;c09/15 | |
| Location | N;Res;Res | N;Res;Res | | N;Res;Res | | N;Res;Res | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 3485 sf | 7841 sf | -3,000 | 6970 sf | -3,000 | 6534 sf | -3,000 |
| View | N;Res;Res | N;Res;Res | | N;Res;Res | | N;Res;Res | |
| Design (Style) | DT3;3 Family | DT3;3 Family | | DT3;3 Family | | DT3;3 Family | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Actual Age | 116 | 116 | | 101 | 0 | 116 | |
| Condition | C4 | C4 | | C4 | | C4 | |
| Above Grade Room Count (Total / Bdrms. / Baths) | 12 / 6 / 3.0 | 14 / 8 / 3.0 | 0 | 12 / 6 / 3.0 | | 18 / 6 / 3.0 | 0 |
| Gross Living Area 15 | 2,916 sq. ft. | 3,364 sq. ft. | -6,720 | 3,277 sq. ft. | -5,415 | 3,589 sq. ft. | -10,095 |
| Basement & Finished Rooms Below Grade | 972sf0sfwu | 1216sf0sfwu | 0 | 1311sf0sfwu | 0 | 1292sf0sfwu | 0 |
| Functional Utility | Adequate | Adequate | | Adequate | | Adequate | |
| Heating/Cooling | HWBB None | HWBB None | | HWBB None | | HWBB None | |
| Energy Efficient Items | None noted | None noted | | None noted | | None noted | |
| Garage/Carport | 3dw | 3gd3dw | -9,000 | 3dw | | 2gd3dw | -6,000 |
| Porch/Patio/Deck | Porches | Porches | | Porches | | Porches | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | [ ] + [X] - | $ 18,720 | [ ] + [X] - | $ 8,415 | [ ] + [X] - | $ 19,095 |
| Adjusted Sale Price of Comparables | | Net Adj. -15.3% Gross Adj. 15.3% | $ 103,280 | Net Adj. -6.3% Gross Adj. 6.3% | $ 124,585 | Net Adj. -14.1% Gross Adj. 14.1% | $ 115,905 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data source(s) Town Tax Assessor

My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data source(s) Town Tax Assessor

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 09/16/2014 | | | |
| Price of Prior Sale/Transfer | $0 | | | |
| Data Source(s) | Tax Assessor | Tax Assessor | Tax Assessor | Tax Assessor |
| Effective Date of Data Source(s) | 04/08/2016 | 04/08/2016 | 04/08/2016 | 04/08/2016 |

Analysis of prior sale or transfer history of the subject property and comparable sales The subject has transferred within the past 36 months by Quit Claim Deed. Previous transfer was not available through assessor's records. The comparable sales have not sold within the past 12 months.

Summary of Sales Comparison Approach. The sales used were the closest in proximity and the most recent and similar which were considered comparable and required the fewest number of adjustments. Sales are within the subject's defined neighborhood. Sale 2 lies mid range of the adjusted values and was considered most reliable. Sale 1 represents the lower end of the value range. Sale 4 has had some recent modernizations/renovations and represents the upper end of the value range. The sales located on the northern side of Route 44 were an extension of the subject's neighborhood and share the same amenities as the subject.

Indicated Value by Sales Comparison Approach $ 125,000

RECONCILIATION

Indicated Value by: Sales Comparison Approach $ 125,000 Cost Approach (if developed) $ 192,000 Income Approach (if developed) $ 0

The Market Approach is considered to be the most reliable method of valuation. The Cost Approach was not considered reliable due age and accrued depreciation. The Income Approach was not developed due to lack of supportive data.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: There are no conditions other than those listed in the attached Limiting and Conditions. Personal property not included in the valuation.

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 125,000 as of 04/11/2016 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055 March 2005 UAD Version 9/2011 Produced using ACI software, 800.234.8727 www.aciweb.com Page 2 of 6 Fannie Mae Form 2055 March 2005 2055_05UAD 12182015

Stratton Associates, LLC

# Exterior-Only Inspection Residential Appraisal Report

File

**ADDITIONAL COMMENTS**

The Intended User of this appraisal report is the Lender/Client. The Intended Use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Users are identified by the appraiser.

In compliance with Ethics Rule of USPAP, I hereby certify that this appraiser has not performed any services regarding the subject property within the 3 year period immediately preceding acceptance of this assignment, as an appraiser or in any other capacity,

To comply with USPAP, the opinion of reasonable exposure time developed in based on sales verification of the comparable and is estimated to be 90-120 days.

The subject property does not appear to have suffered any damage due any recent storms.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) The site value was determined through a paired sales analysis of vacant residential land .

ESTIMATED [ ] REPRODUCTION OR [X] REPLACEMENT COST NEW

Source of cost data Marshall and Swift Cost Handbook

Quality rating from cost service Avg Effective date of cost data 3/2015

Comments on Cost Approach (gross living area calculations, depreciation, etc.)

The Cost Approach was not considered an appropriate method of valuation due to the age and accrued depreciation of the property.

| | | | | |
|---|---|---|---|---|
| OPINION OF SITE VALUE | | | = $ | 25,000 |
| Dwelling | 2,916 Sq. Ft. @ $ | 75 | = $ | 218,700 |
| Bsmt: 984 | Sq. Ft. @ $ | 10 | = $ | 9,840 |
| | | | | |
| Garage/Carport | Sq. Ft. @ $ | | = $ | |
| Total Estimate of Cost-New | | | = $ | 228,540 |
| Less 50 Physical | Functional | External | | |
| Depreciation $68,070 | | | = $ ( | 68,070) |
| Depreciated Cost of Improvements | | | = $ | 160,470 |
| "As-is" Value of Site Improvements | | | = $ | 6,500 |
| INDICATED VALUE BY COST APPROACH | | | = $ | 192,000 |

Estimated Remaining Economic Life (HUD and VA only) 45 Years

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $ X Gross Rent Multiplier = $ Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? [ ] Yes [ ] No Unit type(s) [ ] Detached [ ] Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

Total number of phases Total number of units Total number of units sold

Total number of units rented Total number of units for sale Data source(s)

Was the project created by the conversion of an existing building(s) into a PUD? [ ] Yes [ ] No If Yes, date of conversion.

Does the project contain any multi-dwelling units? [ ] Yes [ ] No Data source(s)

Are the units, common elements, and recreation facilities complete? [ ] Yes [ ] No If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? [ ] Yes [ ] No If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Exterior-Only Inspection Residential Appraisal Report    File No.

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.   I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2.   I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3.   I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4.   I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5.   I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6.   I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7.   I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8.   I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9.   I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10.  I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11.  I have knowledge and experience in appraising this type of property in this market area.

12.  I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13.  I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14.  I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15.  I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16.  I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17.  I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18.  My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19.  I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20.  I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**APPRAISER**

Signature [signature]
Name Pamela F. Stratton
Company Name Stratton Associates, LLC
Company Address 165 Bloomfield Avenue
Windsor, CT 06095
Telephone Number 860-285-0507
Email Address strattonassociates@sbcglobal.net
Date of Signature and Report 04/11/2016
Effective Date of Appraisal 04/11/2016
State Certification # RCR.0000523
or State License # ______
or Other (describe) ______ State # ______
State CT
Expiration Date of Certification or License 04/30/2016

ADDRESS OF PROPERTY APPRAISED
23-25 Sargeant St
Hartford, CT 06105

APPRAISED VALUE OF SUBJECT PROPERTY $ 125,000

LENDER/CLIENT
Name Springhouse, LLC
Company Name Ocwen Loan Servicing, Inc.
Company Address 1661 Worthington Rd
West Palm Beach, FL 33409
Email Address ______

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature ______
Name ______
Company Name ______
Company Address ______
Telephone Number ______
Email Address ______
Date of Signature ______
State Certification # ______
or State License # ______
State ______
Expiration Date of Certification or License ______

SUBJECT PROPERTY
☐ Did not inspect exterior subject property
☐ Did inspect exterior of subject property from street
Date of Inspection ______

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
Date of Inspection ______

# Exterior-Only Inspection Residential Appraisal Report

File N

SALES COMPARISON APPROACH

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 23-25 Sargeant St Hartford, CT 06105 | 26 Westland St Hartford, CT 06120 | | | | | |
| Proximity to Subject | | 1.19 miles NE | | | | | |
| Sale Price | $ | | $ 149,000 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 45.17 sq. ft. | | $ sq. ft. | | $ sq. ft. | |
| Data Source(s) | | GHAR #G10031865;DOM 125 | | | | | |
| Verification Source(s) | | V7007/P272-O.P.$144,900 | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth Conv;0 | | | | | |
| Date of Sale/Time | | s11/15;c07/15 | | | | | |
| Location | N;Res;Res | N;Res;Res | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 3485 sf | 7405 sf | -3,000 | | | | |
| View | N;Res;Res | N;Res;Res | | | | | |
| Design (Style) | DT3;3 Family | DT3;3 Family | | | | | |
| Quality of Construction | Q4 | Q4 | | | | | |
| Actual Age | 116 | 101 | 0 | | | | |
| Condition | C4 | C3 | -10,000 | | | | |
| Above Grade Room Count (Total / Bdrms. / Baths) | 12 / 6 / 3.0 | 17 / 8 / 3.0 | 0 | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Gross Living Area 15 | 2,916 sq. ft. | 3,299 sq. ft. | -5,745 | sq. ft. | | sq. ft. | |
| Basement & Finished Rooms Below Grade | 972sf0sfwu | 1167sf0sfwu | 0 | | | | |
| Functional Utility | Adequate | Adequate | | | | | |
| Heating/Cooling | HWBB None | HWBB None | | | | | |
| Energy Efficient Items | None noted | None noted | | | | | |
| Garage/Carport | 3dw | 3dw | | | | | |
| Porch/Patio/Deck | Porches | Porches | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | [ ] + [X] - | $ 18,745 | [ ] + [ ] - | $ | [ ] + [ ] - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. -12.6% Gross Adj. 12.6% | $ 130,255 | Net Adj. % Gross Adj. % | $ | Net Adj. % Gross Adj. % | $ |

| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | COMPARABLE SALE NO. 5 | COMPARABLE SALE NO. 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 09/16/2014 | | | |
| Price of Prior Sale/Transfer | $0 | | | |
| Data Source(s) | Tax Assessor | Tax Assessor | | |
| Effective Date of Data Source(s) | 04/08/2016 | 04/08/2016 | | |

Summary of Sales Comparison Approach

# Uniform Appraisal Dataset Definitions

File N

## Condition Ratings and Definitions

C1 The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

**Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

C2 The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

**Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.*

C3 The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

**Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.*

C4 The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

**Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.*

C5 The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

**Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.*

C6 The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

**Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.*

## Quality Ratings and Definitions

Q1 Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2 Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residences constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high-quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Q3 Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4 Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5 Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6 Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

## Definitions of Not Updated, Updated, and Remodeled

### Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.
Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical /functional deterioration.

### Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.
An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

### Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/ or expansion.
A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of square footage). This would include a complete gutting and rebuild.

## Explanation of Bathroom Count

The number of full and half baths is reported by separating the two values by a period. The full bath is represented to the left of the period. The half bath count is represented to the right of the period. Three-quarter baths are to be counted as a full bath in all cases. Quarter baths (baths that feature only toilet) are not to be included in the bathroom count.

# Uniform Appraisal Dataset Definitions

File No

## Abbreviations Used in Data Standardization Text

| Abbrev. | Full Name | Appropriate Fields |
|---|---|---|
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| A | Adverse | Location & View |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design(Style) |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| B | Beneficial | Location & View |
| BsyRd | Busy Road | Location |
| cp | Carport | Garage/Carport |
| Cash | Cash | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| Comm | Commercial Influence | Location |
| c | Contracted Date | Date of Sale/Time |
| Conv | Conventional | Sale or Financing Concessions |
| cv | Covered | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design(Style) |
| dw | Driveway | Garage/Carport |
| Estate | Estate Sale | Sale or Financing Concessions |
| e | Expiration Date | Date of Sale/Time |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Garage - Attached | Garage/Carport |
| gbi | Garage - Built-in | Garage/Carport |
| gd | Garage - Detached | Garage/Carport |
| GR | Garden Structure | Design(Style) |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| HR | High Rise Structure | Design(Style) |
| Ind | Industrial | Location & View |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| Listing | Listing | Sale or Financing Concessions |
| MR | Mid-Rise Structure | Design(Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| op | Open | Garage/Carport |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design(Style) |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RT | Row or Townhouse | Design(Style) |
| RH | Rural Housing - USDA | Sale or Financing Concessions |
| SD | Semi-detached Structure | Design(Style) |
| s | Settlement Date | Date of Sale/Time |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site, Basement |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| WtrFr | Water Frontage | Location |
| Wtr | Water View | View |
| w | Withdrawn Date | Date of Sale/Time |
| Woods | Woods View | View |

## Other Appraiser-Defined Abbreviations

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---|---|---|---|---|---|

SUBJECT PROPERTY PHOTO ADDENDUM

| Borrower: Walter Hutton | | File No.: |
|---|---|---|
| Property Address: 23-25 Sargeant St | | Case No.: |
| City: Hartford | State: CT | Zip: 06105 |
| Lender: Ocwen Loan Servicing, Inc. | | |

FRONT VIEW OF
SUBJECT PROPERTY

Appraised Date: April 11, 2016
Appraised Value: $ 125,000

REAR VIEW OF
SUBJECT PROPERTY

STREET SCENE

| Borrower: Walter Hutton | | File No.: | |
|---|---|---|---|
| Property Address: 23-25 Sargeant St | | Case No.: | |
| City: Hartford | State: CT | Zip: 06105 | |
| Lender: Ocwen Loan Servicing, Inc. | | | |

Front View-2

Address Verification-street sign



COMPARABLE PROPERTY PHOTO ADDENDUM

| Borrower: Walter Hutton | | File No | |
|---|---|---|---|
| Property Address: 23-25 Sargeant St | | Case N | |
| City: Hartford | State: CT | Zip: 06105 | |
| Lender: Ocwen Loan Servicing, Inc. | | | |

COMPARABLE SALE #1

40 Elmer St
Hartford, CT 06120
Sale Date: s12/15;c09/15
Sale Price: $ 122,000

COMPARABLE SALE #2

33 E. Raymond St
Hartford, CT 06112
Sale Date: s11/15;c10/15
Sale Price: $ 133,000

COMPARABLE SALE #3

69 Edgewood St
Hartford, CT 06112
Sale Date: s01/16;c09/15
Sale Price: $ 135,000

COMPARABLE PROPERTY PHOTO ADDENDUM

| Borrower: Walter Hutton | | File No.: |
|---|---|---|
| Property Address: 23-25 Sargeant St | | Case No. |
| City: Hartford | State: CT | Zip: 06105 |
| Lender: Ocwen Loan Servicing, Inc. | | |

COMPARABLE SALE #4

26 Westland St
Hartford, CT 06120
Sale Date: s11/15;c07/15
Sale Price: $ 149,000

COMPARABLE SALE #5

Sale Date:
Sale Price: $

COMPARABLE SALE #6

Sale Date:
Sale Price: $

Borrower: Walter Hutton | File No.:
Property Address: 23-25 Sargeant St | Case No.:
City: Hartford | State: CT | Zip: 06105
Lender: Ocwen Loan Servicing, Inc.



| Borrower: Walter Hutton | | File No.: |
|---|---|---|
| Property Address: 23-25 Sargeant St | | Case No.: |
| City: Hartford | State: CT | Zip: 06105 |
| Lender: Ocwen Loan Servicing, Inc. | | |

## Unofficial Property Record Card - City of Hartford, CT

### General Property Data

Parcel Identification [illegible]
Property Owner HUTTON WALTER
Mailing Address 23 SARGEANT ST
City HARTFORD
Mailing State CT Zip [illegible]
ParcelZoning R4

Property Location 0023 SARGEANT ST HARTFORD
Property Use THREE FAMILY
Most Recent Sale Date [illegible]
Legal Reference [illegible]
Grantor HUTTON,WALTER
Sale Price 1
Land Area 0.078 acres

### Current Property Assessment

Fiscal Year 2015
Land Value 5,443
Total Value [illegible]
Building Value [illegible]

### Building Description

| | | |
|---|---|---|
| Building Style Three Family | Foundation Type Stone/Brick | Flooring Type COMBINATION |
| # of Living Units 3 | Frame Type Wood Frame | Basement Floor CONCRETE |
| Year Built 1900 | Roof Structure FLAT | Heating Type Hot Water |
| Building Grade Average | Roof Cover Asphalt | Heating Fuel Gas |
| Building Condition Fair | Siding Composition | Air Conditioning 0% |
| Finished Area (SF) [illegible] | Interior Walls PLASTER | # of Bsmt Garages 0 |
| Number Rooms 12 | Number Beds 6 | # of Full Baths 3 |
| # of 3/4 Baths 0 | # of 1/2 Baths 0 | # of Other Fixtures 4 |

### Legal Description

### Narrative Description of Property

This property contains 0.078 acres of land mainly classified as THREE FAMILY with a(n) Three Family style building, built about 1900 , having Composition exterior and Asphalt roof cover, with 3 unit(s), 12 room(s), 6 bedroom(s), 3 bath(s), 0 half bath(s).

### Property Images

Disclaimer: This information is believed to be correct but is subject to change and is not warranteed.

| | | | |
|---|---|---|---|
| Borrower: Walter Hutton | | File No.: | |
| Property Address: 23-25 Sargeant St | | Case No | |
| City: Hartford | State: CT | Zip: 06105 | |
| Lender: Ocwen Loan Servicing, Inc. | | | |

| | |
|---|---|
| Nominal | Y |
| Buyer Name | Hutton Walter |
| Seller Name | Hutton Cynthia |
| Document Number | 6862-204 |
| Document Type | Quit Claim Deed |

## Mortgage History

| | |
|---|---|
| Mortgage Date | 11/26/2013 |
| Mortgage Amount | $130,000 |
| Mortgage Lender | Santander Bk Na |
| Mortgage Code | Conventional |

## Property Map

**Property Detail**



| Borrower: Walter Hutton | | File No.: |
|---|---|---|
| Property Address: 23-25 Sargeant St | | Case No. |
| City: Hartford | State: CT | Zip: 06105 |
| Lender: Ocwen Loan Servicing, Inc. | | |

**LEXINGTON INSURANCE COMPANY**

WILMINGTON, DELAWARE

Administrative Offices – 99 High Street, Floor 23, Boston, Massachusetts 02110-2378

**Certificate Number:** 018390953-03

**This Certificate forms a part of Master Policy Number** 018389876-03

**Renewal of Master Policy Number :** 018389876-02

**YOUR RISK PURCHASING GROUP MASTER POLICY IS A CLAIMS MADE POLICY.**
**READ THE ATTACHED MASTER POLICY CAREFULLY**

THE AMERICAN ACADEMY OF STATE CERTIFIED APPRAISERS

CERTIFICATE DECLARATIONS

1. **Name and Address of Certificate Holder** Stratton Associates, LLC

PO Box 606
Windsor CT 06095

2. **Certificate Period:** Effective Date: 11/19/15 to Expiration Date: 11/19/16

12:01 a.m. Local Time at the Address of the Insured.

2a. **Retroactive Date:** Full

12:01 a.m. Local Time at the Address of the Insured.

3. **Limit of Liability:** $ 1,000,000 each claim
$ 1,000,000 aggregate limit

4. **Deductible:** $ 2,500 each claim

5. **Professional Covered Services insured by this policy are:** REAL ESTATE APPRAISAL SERVICES

6. **Advance Certificate Holder Premium:** $ 743

7. **Minimum Earned Premium:** 25% or $ 186

**Forms and Endorsements:**
PRG 3150 (10/05) Real Estate Appraisers Professional Liability Declarations, PRG 3512 (07/12) Real Estate Appraisers Professional Liability Coverage Form, 78713 (05/13) Addendum to the Declarations, 89644 (6/13) Economic Sanctions Endorsement, 91222 (04/13) Policyholder Notice, 118477 (03/15) Policyholder Notice

**Additional Endorsments applicable to this Certificate only:**
None

**Agency Name and Address** INTERCORP, INC.
1438-F West Main Street
Ephrata, PA 17522-1345

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE CERTIFICATE HOLDER AGREES TO ALL TERMS AND CONDITIONS AS SET FORTH IN THE ATTACHED MASTER POLICY.

THIS POLICY IS ISSUED BY YOUR RISK PURCHASING GROUP INSURER WHICH MAY NOT BE SUBJECT TO ALL OF THE INSURANCE LAWS AND REGULATIONS OF YOUR STATE. STATE INSURANCE INSOLVENCY GUARANTY FUNDS ARE NOT AVAILABLE FOR YOUR RISK PURCHASING GROUP INSURER.

County: Hartford

Authorized Representative OR
Countersignature (in states where applicable) Date: October 14, 2015

PRG 3152 (10/05)

| Borrower: Walter Hutton | | File No.: |
|---|---|---|
| Property Address: 23-25 Sargeant St | | Case No.: |
| City: Hartford | State: CT | Zip: 06105 |
| Lender: Ocwen Loan Servicing, Inc. | | |

STATE OF CONNECTICUT ♦ DEPARTMENT OF CONSUMER PROTECTION

Be it known that

PAMELA F STRATTON
165 BLOOMFIELD AVE
WINDSOR, CT 06095-2819

has been certified by the Department of Consumer Protection as a licensed

CERTIFIED RESIDENTIAL REAL ESTATE APPRAISER

License # RCR.0000523

Effective: 05/01/2015
Expiration: 04/30/2016

Jonathan A. Harris, Commissioner

Oath

| | | | |
|---|---|---|---|
| Borrower: Walter Hutton | | File No.: | |
| Property Address: 23-25 Sargeant St | | Case No.: | |
| City: Hartford | State: CT | Zip: 06105 | |
| Lender: Ocwen Loan Servicing, Inc. | | | |

DOCKET NO: ______________ : SUPERIOR COURT

______________ : JUDICIAL DISTRICT OF

______________ : ______

______________

VS. : AT ______

______________

OATH OF APPRAISER

I [signature] being duly sworn, depose and say:

1. I am licensed and certified by the State of CT as a real estate appraiser.
2. I am familiar with real estate property values in the Town of Hartford
3. At the request of the Plaintiff, I performed an appraisal of the property located at:
   23-25 Sargeant St
   Hartford, CT 06105
4. My appraisal report is attached hereto and made part of. As of that date, I am of the opinion that the property therein described has a value, as follows:

Value of Land: $ 25000

Value of Building: $ 100,000

Total Value of Property: $ 125000

Effective Date of Appraisal: 4/11, 20 16

5. I request a fee of 200 for the appraisal service rendered.

[signature]

License Number No. RCR573

MY LICENSE EXPIRES: 4/30/16

Subscribed and sworn to, before me, this 11th day of April 2016

[signature]

NOTARY PUBLIC

MY COMMISSION EXPIRES 06/30/2016

ANNA M. POSNIAK
NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 30, 2016

AERIAL MAP

| Borrower: Walter Hutton | | File No.: |
|---|---|---|
| Property Address: 23-25 Sargeant St | | Case No.: |
| City: Hartford | State: CT | Zip: 06105 |
| Lender: Ocwen Loan Servicing, Inc. | | |

Subject
23-25 Sargeant St
Hartford, CT 06105
Homestead Ave
Albany Ave
Sargeant St
Walnut St
Asylum Ave
Farmington Ave
Sigourney St
Garden St
Amtrak Station - HFD
Cathedral of St Joseph
Liam E. McGee Memorial Park
Google
Map data ©2016 Google Imagery ©2016 , Cnes/Spot Image, DigitalGlobe, U.S. Geological Survey, USDA Farm Service Agency

LOCATION MAP

| Borrower: Walter Hutton | | File No.: |
|---|---|---|
| Property Address: 23-25 Sargeant St | | Case No.: |
| City: Hartford | State: CT | Zip: 06105 |
| Lender: Ocwen Loan Servicing, Inc. | | |



# Appraiser Independence Certification

File No

Borrower: Walter Hutton
Property Address: 23-25 Sargeant St
City: Hartford County: Hartford State: CT Zip Code: 06105
Lender/Client: Ocwen Loan Servicing, Inc.

I do hereby certify, I have followed the appraiser independence safeguards in compliance with Appraisal Independence and any applicable state laws I may be required to comply with. This includes but is not limited to the following:

- I am currently licensed and/or certified by the state in which the property to be appraised is located. My license is the appropriate license for the appraisal assignment(s) and is reflected on the appraisal report.
- I certify that there have been no sanctions against me for any reason that would impair my ability to perform appraisals pursuant to the required guidelines.

I assert that no employee, director, officer, or agent of the Lender/Client, or any other third party acting as joint venture partner, independent contractor, appraisal company, appraisal management company, or partner on behalf of the Lender/Client, influenced or attempted to influence the development, reporting, result, or review of the appraisal through coercion, extortion, collusion, compensation, inducement, intimidation, bribery, or in any other manner.

I further assert that the Lender/Client has never participated in any of the following prohibited behavior in our business relationship:

1. Withholding or threatening to withhold timely payment or partial payment for the appraisal report;
2. Withholding or threatening to withhold future business, or demoting or terminating, or threatening to demote or terminate my services;
3. Expressly or implicitly promising future business, promotions, or increased compensation for my services;
4. Conditioning the ordering of the appraisal report or the payment of the appraisal fee or salary or bonus on my opinion, conclusion or valuation reached, or on a preliminary value estimate requested;
5. Requesting an estimated, predetermined, or desired valuation in the appraisal report, prior to the completion of the appraisal report, or requesting estimated values or comparable sales at any time prior to the completion of the appraisal report;
6. Providing an anticipated, estimated, encouraged or desired value for the subject property, or a proposed or target amount to be loaned to the Borrower, except that a copy of the sales contract may have been provided if the assignment was for a purchase transaction;
7. Providing stock or other financial or non-financial benefits to me or any entity or person related to me, my appraisal or appraisal management company, if applicable;
8. Any other act or practice that impairs or attempts to impair my independence, objectivity or impartiality, or violates law or regulation, including but not limited to, the Truth in Lending Act (TILA) and Regulation Z, or the Uniform Standards of Professional Appraisal Practice (USPAP).

Additional Comments:

| APPRAISER: | | SUPERVISORY APPRAISER (only if required): | |
|---|---|---|---|
| Signature: | [signature] | Signature: | |
| Name: | Pamela F. Stratton | Name: | |
| Date Signed: | 04/11/2016 | Date Signed: | |
| State Certification #: | RCR.0000523 | State Certification #: | |
| or State License #: | | or State License #: | |
| or Other (describe): | State #: | State: | |
| State: | CT | Expiration Date of Certification or License: | |
| Expiration Date of Certification or License: | 04/30/2016 | | |



**Loan Number:**
**Complete Reviewed Date:** 04/12/2016 3:14 PM

The Origination Appraisal in Vault describes the subject property as a now 115 year old, 2934 sqft, 3 stories, Three Unit property that has 12 total rooms, 6 bedrooms and 3 bath, in average condition, with unfinished basement, no garage on a 34848 sqft Fee Simple lot in an urban area of Hartford, CT 06105. The 2055e report describes the subject similarly except for GLA of 2916 SF. The Origination Appraisal description was relied on as it was an interior inspection done by a licensed appraiser. Subject property was reported to be owner occupied. Based on the exterior pictures provided in the 2055e report, the subject property appears to be in fair condition. As per aerial view, subject property is located close to a busy road, highway, commercial properties, rail road tracks, school and place of worship and is considered to have an external obsolescence. The subject has not sold in the past 36 months and is not currently listed for sale. Market values are described as stable over the past 12 months, there is an in balance supply of available properties and marketing times were reported as 3 to 6 months. The appraiser provided comps located 0.40 miles to 1.19 miles from the subject property. As per Online data sources, the subject zip code reflects an increase of 16.1% in the prior year. The subject's market appears to have moderate REO impact. (External research presented 33 homes in REO status out of 100 listings in the subject's zip code). Greatest weight was placed on sale comp from online data sources with address 35-37 Brook St,Hartford, CT 06120 (0.23 miles from subject). This comp sold for $75,000 on 08/27/2015 and had a GLA of 2938 sqft, 6 bedrooms and 3 bath, built in 1900 on a lot size of 6664 sqft. Note : as per exterior view subject and comp looks similar in condition hence no made adjustment for condition. Note : unable to verify the comp basement and garage hence no made adjustment for garage and basement . SUPPORTING COMP : was placed on sale comp from online data sources with address 35-37 Brook St,Hartford, CT 06120 (0.23 miles from subject). This comp sold for $75,000 on 02/02/2016 and had a GLA of 3367 sqft, 6 bedrooms and 3 bath, built in 1915 on a lot size of 5625 sqft. No adjustments were made to the comparable Based on the above, the reviewed value for the subject is $75,000 to $75,000. The arrived value is based on price per square footage of the comp calculation method. Value Variance Justification: This represents a significant decrease in values from the current appraiser values as the appraiser is based on the subject property being in superior condition along with comps also in superior condition. Moreover, the comps provided in the prior report were also scattered in design, GLA, values, and proximity. Sales: $ 122,000, $ 133,000, $ 135,000 Listings: $ 149,000, $00,000, $00,000